# APPENDIX TO SUPPLEMENTAL RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## Table Of Contents

Cover Sheet to Deposition of Stanley Pat Hobbs taken on May 17, 2006 ...... APP- 1

Transcript in multiAPP- format including deposition transcript 2-5    ........ APP- 2

Transcript in multiAPP- format including deposition transcript 14-17 ........APP- 3

Transcript in multiAPP- format including deposition transcript 34-37 ........ APP- 4

Transcript in multiAPP- format including deposition transcript 38-41 ........APP- 5

Transcript in multiAPP- format including deposition transcript 46-49.........APP- 6

Transcript in multiAPP- format including deposition transcript 86-89 .......APP- 7

Transcript in multiAPP- format including deposition transcript 90-93 ....... APP- 8

Transcript in multiAPP- format including deposition transcript 94-97 .........APP- 9

Transcript in multiAPP- format including deposition transcript 98-101........APP- 10

Transcript in multiAPP- format including deposition transcript 126-129..... APP- 11

Transcript in multiAPP- format including deposition transcript 130-133 .....APP- 12

Transcript in multiAPP- format including deposition transcript 134-137......APP- 13

Transcript in multiAPP- format including deposition transcript 138-141.. ...APP- 14

Transcript in multiAPP- format including deposition transcript 154-157..... APP- 15

Transcript in multiAPP- format including deposition transcript 158-160......APP- 16

Pat Hobbs

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| JON HARRISON | * | |
| | * | |
| VS. | * | C.A. No. B-04-096 |
| | * | |
| TEXAS STATE TECHNICAL COLLEGE | * | |
| AND INDIVIDUAL DEFENDANTS, | * | |
| DR. J. GILBERT LEAL, | * | |
| PRESIDENT TSTC-HARLINGEN | * | |
| PAT HOBBS, DEAN OF | * | |
| INSTRUCTION, LEONEL GOMEZ, | * | |
| DEPARTMENT CHAIR | * | |

------------------------------------------------------------

ORAL DEPOSITION OF

STANLEY PAT HOBBS

May 17, 2006

------------------------------------------------------------

    Oral deposition of STANLEY PAT HOBBS, produced as a
witness at the instance of the Plaintiff, and duly sworn,
was taken in the above-styled and numbered cause on the 17th
day of May, 2006, from 10:04 a.m. to 3:57 p.m. before GERALD
SMITH, CSR in and for the State of Texas, reported by oral
stenography at Texas State Technical College, 1902 Loop 499,
Harlingen, Cameron County, Texas, pursuant to the Federal
Rules of Civil Procedure and the provisions stated on the
record or attached hereto.

Pat Hobbs

---

**Page 2**

APPEARANCES

FOR THE PLAINTIFF:
 MR. JOHN E. SCHULMAN
 The Schulman Law Firm
 9400 N. Central Expressway
 NCX Building, Suite 416
 Dallas, Texas  75231

FOR THE DEFENDANTS:
 MR. TERENCE L. THOMPSON
 Assistant Attorney General
 P. O. Box 12548, Capitol Station
 Austin, Texas  78711

ALSO PRESENT:
 MR. JON HARRISON

---

**Page 3**

INDEX

Appearances . . . . . . . . . . . . . 2

Stipulations . . . . . . . . . . . . . . . . 4

Examination by Mr Schulman . . . 5
Examination by Mr Thompson . . . . . . . 130
Re-Examination by Mr Schulman . . . . . 134
Re-Examination by Mr Thompson . . . 140
Re-Examination by Mr Schulman . . . . . . 141
Re-Examination by Mr Thompson . . . . 149
Re-Examination by Mr Schulman . . . 151

Signature and Changes . . . 156

Reporter's Certificate . . . . . 158

EXHIBITS
NO    DESCRIPTION    MARKED

---

**Page 4**

1  Oral deposition and answers of STANLEY PAT HOBBS, who
2 resides in Cameron County, Texas, was taken herein by John
3 Schulman, Counsel for the Plaintiff, before Gerald Smith, a
4 Certified Shorthand Reporter in and for the State of Texas,
5 on the 17th day of May, A.D., 2006, pursuant to the Notice
6 issued in the above styled and numbered cause, pursuant to
7 the Federal Rules of Civil Procedure and with the following
8 stipulations and agreements:
9   IT WAS AGREED that the witness must appear in
10 accordance with the Federal Rules of Civil Procedure before
11 any Notary Public or official authorized to administer oaths
12 for purpose of reading over the deposition and making any
13 corrections the witness finds to be necessary, such
14 corrections to be recorded on a correction sheet submitted
15 with the original of the deposition
16
17
18
19
20
21
22
23
24
25

---

**Page 5**

1   STANLEY PAT HOBBS,
2 having been first duly sworn, testified as follows:
3   EXAMINATION
4 BY MR. SCHULMAN:
5  Q  Good morning, Mr. Hobbs.
6  A  Good morning.
7  Q  Are you appropriately called Mr. Hobbs, or Dr.
8 Hobbs, or what is your title?
9  A  Mister.
10  Q  Mr. Hobbs.
11  A  I'm not a doctor.
12  Q  Okay. Would you tell me a little bit about your
13 educational background?
14  A  I have a -- my highest degree is an MBA from
15 what's now Texas A&M Kingsville.
16  Q  Okay. And could you tell me, briefly, about your
17 career in the field of education?
18  A  Directly after my bachelor's, I taught high school
19 in Los Fresnos for three years while I worked on my
20 master's, driving back and forth to Kingsville when I
21 attended the master's. In about '71 I moved to the Texas
22 Southmost College in Brownsville as an instructor. Over a
23 tenure of 18 years there, I moved from instructor to
24 department chair to assistant dean to dean.
25  Q  What chair -- of what department were you the

 APP- 2

Pat Hobbs

---

**Page 14**

1    Q   (Mr. Schulman)  Okay.  So you're going to refuse
2 to answer my question because Mr. Thompson has instructed
3 you to?
4    A   I'm not going to refuse to answer the question.
5 I'm going to refuse to perform an activity that's not
6 appropriate.  You show me a document, and I'll tell you
7 whether or not it's the document.
8         MR. SCHULMAN:  And what would be the basis
9 for your instruction, Counsel, under the Federal Rules of
10 Civil Procedure, other than being uncooperative?
11        MR. THOMPSON:  If you want to look through
12 there -- he's not going to do research for you during your
13 deposition.  He says he saw one in there.  You can't make
14 him go through documents and find one, so I'm going to tell
15 him not to do that.  I don't mean to be uncooperative, but
16 that's just not how it works.
17    Q   (Mr. Schulman)  So this has -- this has now been
18 established that you're not going to answer the question
19 because Mr. Thompson has told you not to, right?
20    A   I did answer the question.
21    Q   Am I correct in understanding, Mr. Hobbs, that you
22 made a recommendation to terminate or to non-renew Mr.
23 Harrison?
24    A   Two separate things.
25    Q   Well --

---

**Page 15**

1    A   The decision was to non-renew.
2    Q   Okay.  Let's take a look together, if you don't
3 mind, I think you have a set in front of you --
4    A   You show me.
5    Q   -- at Exhibit No. 4.  I'm not going to --
6         MR. THOMPSON:  There you go
7    Q   (Mr. Schulman)  I'm not going to come stand under
8 your nose.  I would like you to look at the one that's right
9 in front of you, if that's okay.  When you've had a chance
10 to review Exhibit No. 4 carefully, will you please tell me?
11    A   Okay.
12    Q   All right.  Do you recognize Exhibit No. 4?
13    A   Yes, sir.
14    Q   And how would you identify it, sir?
15        MR. THOMPSON.  Objection, form.
16    A   I would identify it as a memo from me to the
17 president requesting that the president non-renew Jon
18 Harrison for next year's contract
19    Q   (Mr. Schulman)  Okay.  And the date of Exhibit No.
20 4 is June 12th, 2002; is that right?
21    A   Yes, sir.
22    Q   And is that -- was it on that date that you --
23 that you added your signature to the from line, June 12th of
24 2002?
25    A   Most probably so.

---

**Page 16**

1    Q   Okay.  Is that your handwriting that --
2    A   Yes, it is
3    Q   -- says Pat Hobbs?
4         MR. THOMPSON:  You have to wait for his
5 question to finish --
6         WITNESS:  Okay
7         MR. THOMPSON  -- before you answer
8    Q   (Mr. Schulman)  Yeah, remember about me asking
9 slow questions?
10    A   All right
11    Q   Okay.  And is that your handwriting that says
12 6-12-02?
13    A   Yes, it is.
14    Q   Okay.  Now do you recall how long the subject of
15 non-renewing Mr. Harrison had been under your consideration
16 before you signed Leal Exhibit No. 4 on 6-12 of '02?
17    A   Not specifically, but for some time.
18    Q   Okay.  And when you say for some time, would you
19 mean weeks, months?
20    A   Couple of years
21    Q   Let me ask you then, since it had been under your
22 consideration for a couple of years prior to June 12th,
23 2002, to tell me the earliest matter of concern or incident
24 that led you to start thinking about non-renewing Jon
25 Harrison?

---

**Page 17**

1    A   I can't tell you that, specifically, but there are
2 a series of incidents that took place that were called to my
3 attention, or to the attention of his supervisor, that were
4 communicated to me
5    Q   Okay.  You know, you've indicated to me that this
6 had been under consideration for a couple of years.  I
7 realize you may not be able to give me the exact sequence,
8 but to the best of your recollection, can you identify for
9 me incidents that were one year or more old at the time that
10 you signed Exhibit No. 4?
11    A   I can remember one incident that -- when we had a
12 company touring the college contemplating moving to
13 Harlingen and establishing a business, and they toured our
14 facility as an economic development factor in training and
15 so forth, for them  When Mr Harrison was the chairman, we
16 took this group through his program, and as he was talking
17 to those gentlemen, he made some comments that were -- I
18 thought were unprofessional and unbecoming of a person in
19 his position
20    Q   Okay.  Let us discuss, first of all, whether you
21 were present when the alleged unprofessional comments were
22 made?
23    A   Yes, I was
24    Q   Okay.  So you part of the touring group?
25    A   I was.

---



Pat Hobbs

Page 34

1  Q  In 2002.
2  A  No, I don't.
3  Q  Well, let me ask you this. Do you recall,
4  generally, that Mr. Harrison received an evaluation in May
5  of 2002 where every single category was marked with a
6  category — let's see, what do you guys call it? You call
7  it expect — expected level of performance?
8  A  No, sir. I don't review all faculty evaluations.
9  Q  Okay. Well, let me ask you this, a specific
10 question. Do you remember noting and considering that in
11 May of 2002 Mr. Harrison got an evaluation of his
12 interaction with colleagues and students that was
13 satisfactory, and here it was in June of 2002 you were
14 recommending his termination, or his non-renewal, because
15 he, allegedly, did not get along with colleagues and
16 students? Do you remember noting that contrast in your
17 mind?
18  A  No, because I didn't review his evaluation at that
19 time.
20  Q  Okay.
21  A  The only time I would have seen that is when it
22 was presented as a part of the documentation for the
23 faculty's request for some action to be taken.
24  Q  So when the faculty requested that some action be
25 taken about Mr. Harrison, did you review his most recent

Page 35

1  evaluation in that package?
2  A  I can't definitively say I did or did not. I
3  might have.
4  Q  But you don't recall being troubled or concerned
5  because he had a very recent evaluation where he was rated
6  as meeting the expected level of performance with regard to
7  his interaction with faculty and — colleagues and students,
8  and here you had a complaint about allegedly inadequate
9  performance in that same area?
10  A  No, not a particular concern, because that's only
11 one piece of the -- of the total situation.
12  Q  Well, the 2002 evaluation, if I'm correct, should
13 have been executed by Mr. Gomez, correct?
14  A  Right.
15  Q  And it should have reflected Mr. Gomez' honest
16 evaluation of one entire year of performance; is that right?
17  A  In his opinion, yes.
18  Q  Okay. Now your recommendation to terminate, which
19 we've identified as Exhibit 4 to Mr. Leal's deposition, was
20 it accompanied by a package of supporting material?
21  A  It wasn't a recommendation to terminate. It was a
22 recommendation to non-renew next year's contract.
23  Q  I stand corrected.
24  A  And, yes, it was accompanied by a group of
25 documents that supported their recommendation.

Page 36

1  Q  All right. And what documents accompanied
2  Exhibit 4?
3  A  There were a series of them. I can't -- I can't
4  list all of them, but they were examples of e-mails, memos,
5  evaluations, et cetera, that demonstrated their contention
6  of Jon Harrison's uncooperative attitudes.
7  Q  I'm going to try to rephrase the question that Mr.
8  Thompson objected to before. If you will assume with me
9  that Mr. Harrison had a fully satisfactory evaluation in May
10 of 2002, and then we'll take as given that he was not
11 incapacitated, there was no financial need for his non-
12 renewal, and he had -- and the disciplinary -- formal
13 disciplinary process had not been used with regard to Mr.
14 Harrison during his tenure of employment, would he have a
15 reasonable expectation that he would get another contract in
16 the year when you recommended that he did not, in the year,
17 the education year where you recommended in Exhibit 4 that
18 he be non-renewed?
19         MR. THOMPSON  Objection, form. Calls for a
20 legal conclusion. Otherwise, you can answer the question.
21         MR. SCHULMAN. Thank you.
22  A  In the first place, not every incident of
23 objectionable behavior is a matter of record and documented,
24 nor is the faculty member's evaluation a comprehensive
25 review or evaluation of a full year's activity, or

Page 37

1  relationships or incidences. It's -- it's a judgment on the
2  part of the department chair at that time, on those 16 items
3  that are in the document, as to whether or not the faculty
4  member is meeting the expected performance level in those 16
5  areas.
6  Q  (Mr. Schulman) Let me ask you this.
7  A  There's a lot more to a decision to non-renew than
8  just a faculty evaluation document, or whether or not a
9  formal grievance was serious enough to work through the
10 grievance procedure.
11         There are incidences that occur where the
12 department chairman or the division director have a verbal
13 communication with a faculty member to -- about an incident
14 that, in their opinion, needs to be approved, may or may not
15 be documented, may be documented. Based on a faculty
16 evaluation, they may develop a professional development plan
17 with the expectation that the faculty member can improve his
18 performance and remain a faculty member. So -- I don't know
19 if that answers your question, but there is no expectation
20 past the contract period that any faculty member will be
21 renewed. It's written in the documents. So whether or not
22 there's an expectation, that's every individual's own -- own
23 mind working. I have no expectation that any faculty member
24 is going to get a contract renewal.
25  Q  Would you agree with me, Mr. Hobbs, that if there


APP-4

Pat Hobbs

**Page 38**

1 was an incident of serious misconduct by a faculty member,
2 two things would be expected? One, it would be documented,
3 and, two, it would be the subject of formal discipline?
4        MR. THOMPSON: Objection, form
5    A   Not necessarily There are degrees of severity,
6 and it's a decision on the part of management, all the way
7 from the department chair through division director to me
8 and the president, whether or not the incident -- and the HR
9 department, by the way -- whether or not the incident calls
10 for reprimand or disciplinary action or dismissal or
11 whatever that policy covers
12    Q   (Mr. Schulman) And that exercise of discretion
13 that you're referring to relates, doesn't it, sir, to the
14 seriousness of the incident?
15       MR. THOMPSON: Objection, form
16    A   In management's opinion
17    Q   (Mr. Schulman) So if there were incidents of
18 alleged misconduct by Mr. Harrison that were not documented
19 and were not the subject of formal discipline, it would be
20 reasonable for the judge and jury in this case to conclude
21 that they were not considered to be serious at the time;
22 isn't that true?
23    A   They could be serious in the opinion of the
24 department, but not serious enough in the -- in the opinion
25 of HR and upper level management to warrant invoking

**Page 39**

1 disciplinary procedures under that disciplinary policy  We
2 would ask that the department try and work with the
3 individual to improve that behavior without having to resort
4 to that policy.
5    Q   Would you agree with me, Mr. Hobbs, that one of
6 the things you were trying to get across to President Leal
7 in Exhibit 4 was that Mr. Harrison had a bad attitude?
8    A   At the minimum
9    Q   Okay. And starting with bad attitude at the
10 minimum, what more were you trying to communicate?
11    A   Well, an attitude, an expressed attitude of
12 uncooperative -- uncooperativeness, belligerence, that had
13 grown to the point of disrupting the operations of the
14 department, to the disadvantage of the institution.
15    Q   Okay. So I know we've discussed an undocumented
16 incident that you can recall that had to do with touring
17 businessmen. Would you consider that to be one of the
18 examples of disruptive misconduct by Mr. Harrison?
19    A   Yes.
20    Q   Can you recall an example of alleged disruptive
21 misconduct by Mr. Harrison that occurred after the touring
22 business people incident?
23    A   No, I don't -- I don't keep track of dates that
24 well.
25    Q   Do you recall before you wrote Exhibit 4

**Page 40**

1 recommending non-renewal, that Mr. Harrison received a 2001
2 evaluation where he was rated as needing improvement and --
3 in the area of attitude, or interactions with others?
4    A   At that time, no
5    Q   Did you find that out --
6    A   I don't recall.
7    Q   Has that come to your attention since you wrote
8 Exhibit 4, that Mr. Harrison had a needs improvement in 2001
9 in that area?
10    A   I'm not sure that I didn't review the file and see
11 that  I just can't specifically recall it right now
12    Q   Okay. Do you recall from reviewing the file prior
13 to writing Exhibit 4, that Mr. Harrison was asked to attend
14 training about negative attitude?
15    A   Yes
16    Q   Do you recall from reviewing the file he did attend
17 the training, and that the fact that he had done so and
18 satisfactorily completed the training was part of the
19 information presented to you?
20    A   Specifically, no  I remember that there had been
21 incidences that had prompted the faculty -- or the
22 supervisor to request that some corrective action be taken
23 and a professional development plan be installed, and I know
24 that was installed because I was a part of the -- of the so-
25 called remedy

**Page 41**

1    Q   And when you say a professional action plan, are
2 you referring to some other incident or situation than the
3 one where he was asked to take training about attitude?  Was
4 it that, separate and apart, or is the needs improvement in
5 2001 where he was asked to take training and did take
6 training, is that the development plan you're referring to?
7        MR. THOMPSON: Objection, form  Counsel,
8 that was -- that was messy.  Do you want him to answer that
9 question?
10    Q   (Mr. Schulman) If you understood my question,
11 please feel free to answer it.  If you didn't, I'll be happy
12 to try to rephrase it.
13    A   I'll answer it this way. I mentioned a while ago
14 that there are several different activities that take place
15 and observations that are a part of an overall evaluation of
16 a faculty member and whether or not their contract is non-
17 renewed or renewed for the next year.  One of those is
18 student evaluations, and which we give to the students for
19 the faculty and they respond to certain questions about how
20 the faculty member teaches the class.  If we get a highly
21 negative response on those surveys, then that prompts us --
22 that's another piece of information that prompts us to
23 decide whether or not we need to take corrective action with
24 a faculty member.  As I recall, it was a student evaluation,
25 not the faculty evaluation instrument that prompted the

Action Reporting
(956) 631-1024



Pat Hobbs

**Page 46**

1   Q   Okay. Now about student evaluations, would you
2   agree with me that in most cases teachers or professors
3   receive some outstanding evaluations, some negative
4   evaluations, and a group of evaluations in the middle?
5         . MR. THOMPSON: Objection, form.
6   A   The evaluation from students can be varied, if
7   that's what you're asking, from good to bad.
8   Q   (Mr. Schulman) And you had identified a student
9   evaluation that was negative about Mr. Harrison?
10  A   No. What we get is a composite. All of the
11  students of all of each faculty member's classes are given
12  the evaluation. The institutional effectiveness office does
13  a composite of all of those Scantron sheets and gives the
14  department chairman a composite for each individual faculty
15  of what the scores were, so to speak, and then a list of any
16  comments that were made by students, and then they evaluate
17  that and review that and use it as a -- as a tool to improve
18  the performance of the faculty.
19  Q   Okay. So can you tell me which particular year it
20  was that the process of having Ms. Parker observe Mr.
21  Harrison's classes started?
22  A   No, but I'm assuming that it would have been the
23  immediate prior year to the year that she made the visits.
24  Q   Okay.
25  A   Could have been the same year.

**Page 47**

1   Q   Okay. But right now, as you sit here, you can't
2   tell me whether that was one, two, or three years, or more
3   before June of 2002, right?
4   A   I'm saying it was approximate to the time she made
5   her visits, because that would have prompted the visits,
6   prompted the development plan to be written.
7   Q   Okay. Now, I'm sorry, didn't you say this was an
8   unwritten development plan?
9   A   I think I said I'm not sure whether it was written
10  or not Sometimes – now there's a specific form for them,
11  a PIP, but back then the process was probably just being
12  developed   I'm not sure it was a written plan, or not
13  Q   Okay. I suppose that you've put in place the
14  requirement to have a written development plan so that
15  communication will be clearer; is that right?
16        MR. THOMPSON: Objection, form
17  A   It was another effort on our part to improve our
18  performance evaluation of our faculty and better document
19  things
20  Q   (Mr. Schulman) Okay. Well, let me rephrase my
21  question. Do you share with me, Mr. Hobbs, the thought that
22  a written performance evaluation plan is superior to an
23  unwritten performance evaluation plan because the written
24  plan is clearer?
25        MR. THOMPSON  Objection, form.

**Page 48**

1   A   I'm not sure it's clearer, but the written plan
2   probably works better for most employees.
3   Q   (Mr. Schulman) Has less room for question about
4   what's supposed to happen, is that fair?
5   A   I think that's fair.
6   Q   Okay. Mr. Harrison was a full-time contract
7   faculty member until he was non-renewed, correct?
8   A   Yes, sir
9   Q   And would you agree with me that if a senior
10  instructor, full-time faculty member receives the rating
11  expected, as a level in his evaluation, that Texas State
12  Technical College considers him, in general, to be a good
13  employee?
14  A   In general.
15  Q   Okay. And by contrast, if a faculty member
16  receives a rating of deficient, that denotes that he needs
17  improvement, or her, in his or her performance?
18  A   In a specific area
19  Q   Right. Now would you agree with me that in terms
20  of the regulatory structure that applies to the Texas State
21  Technical College, there is one level of documentation that
22  are policy statements of the board of regents called system
23  operating standards?
24  A   Yes
25  Q   Okay. And those standards are applicable at all

**Page 49**

1   campuses including this one, correct?
2   A   Correct
3   Q   Okay. And then, if I'm correct in my
4   understanding. the individual campuses develop policies and
5   procedures of their own that are -- that derive from the
6   system operating standards; is that true?
7   A   That's true
8   Q   But you're not free, and you have no discretion to
9   adopt a practice, policy, or procedure that's inconsistent
10  with the system operating standards; is that true?
11  A   That's my understanding.
12  Q   Am I correct in understanding that there is a
13  system operating standard for faculty evaluation?
14  A   Yes
15  Q   And that applies to all of the campuses?
16  A   Yes.
17  Q   And by the same token. you have no discretion, you
18  have to follow that policy. or that operating standard?
19  A   Yes.
20  Q   What is your duty or responsibility, Mr. Hobbs, as
21  a dean, or now as vice president, if it comes to your
22  attention that a system operating standard of the Texas
23  State Technical College system is not being followed?
24  A   If I'm made aware that an SOS is not being
25  followed intentionally, and it falls under my division?

APP-6

Pat Hobbs

---

**Page 86**

1 explain why our stated teaching load policy was what it is,
2 the 18 to 24 teaching range for faculty in the technical
3 programs, and so I was trying to explain to him why we have
4 that load, and why it's difficult to compare our specific
5 teaching load requirements with those of other colleges that
6 do not have the same makeup, mission, so forth.
7     Q    (Mr. Schulman)  And could you help me understand
8 in language a lawyer can grasp onto why it's difficult to
9 compare teaching at TSTC with teaching at any other college?
10        MR THOMPSON:  Objection, form.
11    A    I can tell you that the -- there is a need for
12 each individual college to determine what the teaching load
13 of its faculty will be in order to do a good job of
14 instruction for the students, and still be able to operate
15 within the budget guidelines that they are given
16 Universities, in their role and scope, are completely
17 different from a technical college like TSTC.  Our whole
18 mission is advanced in emerging programs, highly intensive,
19 lab intensive delivery of instruction, and that requires
20 what some may consider to be a teaching load higher than
21 normal, but normal has never been established
22        The university professors, some will only
23 teach three hours, but there are other responsibilities that
24 they have for research and writing and grant writing and all
25 kind of things.  Community colleges may vary from 12 to 18,

---

**Page 87**

1 but they may count lab differently in a ratio to lecture.
2 There's just all kinds of differences  I don't think it's
3 fair to compare everybody's teaching load.
4     Q    (Mr. Schulman)  Now it looks like on Exhibit 23 at
5 the top when you responded to Mr. Turbeville, that you were
6 answering a communication from him on the same date at
7 11:37.
8     A    Okay, I agree.
9     Q    And in regard to that part of the communication,
10 his initial communication with you, he refers to a contact
11 back in January, "A faculty member approached the faculty
12 senate making the case that the normal teaching load for a
13 college level faculty is 12 hours per week, while our
14 standard teaching load peaks at an average of 24 hours per
15 week."  First of all, let me ask you that if a professor
16 chose to communicate with the faculty senate or others about
17 his perception that teaching twice as much as an ordinary
18 professor does is not a good choice, would that be some kind
19 of disrespectful or insubordinate communication?
20        MR THOMPSON:  Objection, form.
21    A    I wouldn't consider it so.  It depends on how it
22 was presented, but it's a fair question.
23    Q    (Mr. Schulman)  Okay.
24    A    In and of itself.
25    Q    Right.  And would you agree with me that the

---

**Page 88**

1 proper staffing level for a public institution is a matter
2 with which the public, itself, would properly be concerned?
3        MR. THOMPSON:  Objection, form, calls for a
4 legal conclusion  Your answer can't comprise comment on the
5 legal conclusion  If you understand it in some other
6 fashion, you can answer the question.
7        MR. SCHULMAN:  That was much too much of a
8 coaching objection, Counsel
9        MR. THOMPSON  No, it's not, and I'll make
10 the very same objection every time you ask him about matters
11 of public concern.  So if we just want to make that
12 agreement right now that I'll give him that exact same
13 instruction every time you ask about matters of public
14 concern, because that is a legal question that he's not
15 competent to answer.
16    Q    (Mr. Schulman)  Mr. Hobbs, how long have you been
17 an educational administrator?
18    A    Probably 25 of the 40 years.
19    Q    And your accountability as a public educational
20 administrator is ultimately to the public, is it not?
21    A    I work for the State of Texas.
22    Q    And whether or not the teachers under your
23 administration are being subjected to an unreasonably high
24 teaching load is a matter of public concern as you
25 understand that term, is it not, sir?

---

**Page 89**

1        MR. THOMPSON:  I will give you the same
2 instruction.  You can't answer what is or is not a matter of
3 public concern.  That's a question of law for the court to
4 decide.
5        MR. SCHULMAN:  I tried to phrase my question
6 so that I excluded the legal issue and asked about his
7 understanding, Counsel.
8        MR. THOMPSON:  Same objection.
9        MR. SCHULMAN:  Are you telling him not to
10 answer that question?
11        MR. THOMPSON:  Have you heard me say don't
12 answer the question?  I've just instructed him and made my
13 objection for the record.
14        MR. SCHULMAN:  I think what you're doing is
15 perfectly clear.
16        MR. THOMPSON:  Very fine.
17    Q    (Mr. Schulman)  Would you mind answering my
18 question?
19    A    I think that's a personal view of everybody that
20 looks at the situation.  You know, some people may consider
21 it of importance to a broader group than the faculty on this
22 campus, but others may not.  I was addressing a direct
23 question to me about why our teaching load is what it is.
24 and it's deemed by me to be fair, and --
25    Q    Okay.  And if a professor who is concerned about

---

Pat Hobbs

**Page 90**

1 what he perceived to be an excess teaching load, having
2 brought up the subject matter went on to say words to the
3 effect of, "This is what causes people to join unions," he
4 would be perfectly within his rights to make that
5 observation, as well, would he not?
6          MR. THOMPSON: Objection, form.
7     A   I think that's his opinion.
8     Q   (Mr. Schulman) Would you find that insubordinate,
9 or offensive, or troublesome in any way?
10    A   Not particularly. It's just another indicator of
11 malcontent of an employee, but it's his right.
12    Q   So an employee who complained about a higher than
13 average teaching load and went on to say, "This is the kind
14 of thing that causes people to join unions", would be
15 exhibiting what you consider to be malcontent?
16    A   I would consider that his opinion of the
17 situation, and what it causes. I can't -- I can't guess
18 what that mental activity is. I don't have to agree with
19 it
20    Q   Now if you can help me puzzle out Exhibit 24 and
21 how it relates to Exhibit 25, it appears to be the same day,
22 and it's a communication from Mr. Turbeville to Mr.
23 Harrison.
24          MR. THOMPSON: I'm going to object to the
25 form of the question  You can't help puzzle out or

**Page 91**

1 whatever.  You can answer specific questions about the
2 document if they're posed to you.
3     A   It appears that I responded to his question, and
4 then he relayed his interpretation of my response to Jon
5 Harrison on the 17th of July '02.
6     Q   (Mr. Schulman) And it's about the same subject
7 matter, faculty — what's being called faculty productivity
8 standard, right?
9     A   I presume so.
10    Q   And it's about how you arrived at the judgment
11 that faculty should teach up to 24 hours per week, in
12 specific, right?
13    A   It's not specifically my decision.  It was those
14 parameters for teaching load of faculty are determined at —
15 at a higher level than just this campus.  It's a systemwide
16 decision of the instructional administrators of all four
17 campuses meeting with the systems officers.
18    Q   Now Exhibit No. 25 appears to bear the next day,
19 July 18th, 2002, next date, that's again about 24 hour
20 loads.  Do you see that on Exhibit 25?
21    A   Uh-huh.
22    Q   And then it appears that Professor Turbeville is
23 forwarding your reply again to Mr. Harrison?
24    A   That's what it looks like.
25          MR. THOMPSON: Objection, form.  We don't

**Page 92**

1 have any professors here, just for the record, so objection,
2 form
3     Q   (Mr. Schulman) We don't call people who teach —
4     A   No.
5     Q   — at this college —
6          MR. THOMPSON: No.
7     Q   (Mr. Schulman) — professor?
8     A   No, we do not
9     Q   Is that a —
10    A   There is a title.  There is a status of professor,
11 but only certain faculty who have attained that rank can use
12 that title
13    Q   I see.
14    A   Our normal faculty title is instructor
15    Q   I see. So we have a discipline or a practice
16 where we don't let certain people who teach at a college
17 refer to themselves as professor, only special people?
18    A   They can refer to themselves however they want.
19 Their title, according to the college, is an earned title,
20 and may or may not be professor.
21    Q   Well, I hope that I didn't offend you by referring
22 to a man who teaches at a college as a professor, Mr. Hobbs.
23    A   It's quite all right.  Just making it clear.  It
24 does appear that Mr. Turbeville on the next day after he
25 sent this note to Mr. Harrison sent Mr. Harrison the full

**Page 93**

1 text of my response to him in regard to faculty loads.
2     Q   Okay.  And I guess is it correct then that David
3 Turbeville, the department chair of the electric —
4 electromechanical engineering technology department is not
5 one of those people who deserves the title "professor"?
6     A   He might deserve it, but he doesn't have it  He's
7 an instructor and department chair.
8     Q   I mean, according to your practice or your
9 judgment, he should be called instructor, rather than
10 professor?
11    A   It's according to college policy on rank.
12    Q   Okay.
13    A   Faculty rank.
14    Q   All right.  So am I correct in understanding that
15 as late as July 17th and July 18th of 2002 Mr. Harrison's
16 critique of your judgment about the 24 hour teaching load
17 was still under discussion among yourself, Instructor
18 Turbeville, and Mr. Harrison?
19          MR. THOMPSON: Objection, form
20    A   I don't think anywhere in here it shows that I
21 knew that the faculty member that David Turbeville was
22 talking about was Jon Harrison  I wasn't copied on any of
23 that correspondence
24    Q   (Mr. Schulman) So —
25    A   So I had to assume it was a general question posed

**Action Reporting**
(956) 631-1024

APP-8

Pat Hobbs

**Page 94**

1 by some faculty member, and I was responding to it just as I
2 would anybody.
3    Q    So is it your testimony, Mr. Hobbs, that the
4 critique that was made by Mr. Harrison of your 24 hour
5 staffing decision was not brought to your attention and you
6 did not know it was Mr. Harrison who addressed that matter
7 to the faculty senate, or do you recall?
8    A    To the best of my knowledge, I did not know that
9 that question came from Jon Harrison, and it was not a
10 consideration in the non-renewal of Mr. Harrison.
11    Q    So to the best of your knowledge, you didn't know
12 it was Mr. Harrison?
13    A    That's right.
14    Q    Would that be -- would the same thing be true that
15 to the best of your knowledge you don't know, or you can't
16 say whether he also said, "This is the kind of thing that
17 makes people join unions"?
18         MR. THOMPSON: Objection, form.
19    A    That Mr Harrison said that?
20    Q    (Mr. Schulman) In his communication to the
21 faculty senate?
22    A    I saw that in the documentation that was presented
23 to me by the faculty when they recommended that he be non-
24 renewed
25    Q    Okay. So --

**Page 95**

1    A    That's the first time I saw it, the only time I've
2 seen it.
3    Q    Now when you saw in the documentation that was
4 presented by the faculty in support of a recommendation that
5 Mr. Harrison be non-renewed, you saw the document where he
6 critiqued your 24 hour judgment and you saw the comment that
7 this is the kind of thing that makes people join unions,
8 right?
9    A    Yes.
10    Q    And at that time you thought about that the same
11 thing you told me a few minutes ago, it was another example
12 of Mr. Harrison as a malcontent. That's what you thought,
13 didn't you, sir, when you saw that?
14    A    The whole package was a demonstration of his
15 attitudes toward the college, his fellow peers, students,
16 the whole package, administration. The whole package is
17 what was considered.
18    Q    And that was just another example you found in the
19 package, correct?
20    A    It was one example.
21         MR. THOMPSON: Can we go off the record for a
22 moment, please?
23         MR. SCHULMAN: So we can coach, or what?
24         MR THOMPSON  No, I want to -- no  I'll sit
25 right here in front of you

**Page 96**

1         (OFF THE RECORD) (1:58-2:03)
2    Q    (Mr. Schulman) Would you please turn your
3 attention to Leal Exhibit No. 6?
4    A    Okay
5    Q    When you've had a chance to review that exhibit,
6 would you please let me know?
7    A    Okay.
8    Q    Do you recognize Leal Exhibit No. 6 to be a
9 performance evaluation for Jon Harrison for 2002?
10    A    Yes, sir.
11    Q    Have you seen this document before today?
12    A    Yes, sir.
13    Q    Did you consider this document or some version of
14 it when you made your non-renewal recommendation?
15    A    I may have  I can't say for sure whether I did or
16 did not.
17    Q    On page 2, 3, 5, 7, 9, 11, 13, 15 -- I guess I
18 should say and 15 of the evaluation instrument, someone has
19 noted, "Document added to file". Do you see that?
20    A    Yes
21         MR. HARRISON: That was me.
22    Q    (Mr. Schulman) When you saw this -- I'm sorry,
23 when you saw this evaluation prior to today, did it have
24 that notation on it?
25    A    If I reviewed this document in his personnel file,

**Page 97**

1 prior to making the non-renewal recommendation, then it
2 would not have had that notation on it  If you're referring
3 to my review of it just recently as a part of Dr. Leal's
4 deposition, then, yes, it did have that documentation on
5 there.
6    Q    Okay. Thank you. Now that was Mr. Harrison's
7 evaluation for the last teaching year in which he served as
8 an instructor, correct?
9    A    Yes, sir
10    Q    And would you agree with me that there is no -- no
11 evaluation on the 2002 instrument below the level of
12 expected performance?
13    A    There's a zero on 16, no points for other
14 participatory activities
15    Q    On 16, page 16, or item 16?
16    A    Item 16.
17    Q    Let me turn to that.
18    A    I see no needs improvement markings on any of the
19 other categories.
20    Q    Okay. Would you agree with the general
21 proposition that if a decision to renew or not renew is
22 based on an evaluation, that a rating of expected is good
23 enough to get a professor renewed for the following year?
24         MR THOMPSON: Objection, form.
25    A    I would disagree that the faculty evaluations is

Pat Hobbs

Page 98

1 the sole instrument, or could be ever considered in the case
2 of a non-renewal decision. It can or cannot be a part of
3 the decision.
4    Q   (Mr. Schulman) Okay. I'm sorry, I didn't
5 understand the could be ever part. What did you mean?
6    A " We might make a non -- a decision to non-renew
7 based on factors that have nothing to do with performance
8 evaluations.
9    Q   Well, ordinarily, if you were going to make a
10 decision to non-renew based on something that was addressed
11 in an evaluation by the immediate supervisor, you would take
12 that evaluation into consideration, wouldn't you?
13       MR. THOMPSON  Objection, form
14    A   Ask that again.
15    Q   (Mr. Schulman) Sure. You know, I'm understanding
16 -- I understand that there could be subject matters that the
17 evaluation doesn't cover that might come to your attention
18 and that might contribute to a non-renewal decision. Am I
19 correct in that?
20    A   That's true
21    Q   But if a faculty member had a recent evaluation
22 on, say, item 14, "Exhibits professional behavior towards
23 colleagues", you would ordinarily take that recent
24 evaluation into consideration, wouldn't you?
25       MR. THOMPSON  Objection, form.

Page 99

1    A   Not necessarily  The decision to non-renew may or
2 may not have anything to do with performance.
3    Q   (Mr. Schulman) Okay. Well, in this particular
4 example on item 14 we find, "Exhibits professional behavior
5 towards colleagues", correct?
6    A   Yes, sir.
7    Q   And we have a checkmark by "Faculty member listens
8 openly to different viewpoints of colleagues when resolving
9 conflict", correct?
10    A   That's marked
11    Q   And we have a checkmark by "Faculty member
12 refrains from criticizing other faculty members in the
13 presence of students", do we not?
14    A   Yes, but that checkmark could just be the fact
15 that the department chair covered that item with him,
16 doesn't mean that it's a good or exceeds or anything
17    Q   And we also have a checkmark, for whatever that
18 means, by "Faculty member works harmoniously and effectively
19 with colleagues for the benefit of the department and
20 college", correct?
21    A   There's a checkmark there, yes
22    Q   And all three of those checkmarks on subpoints
23 appear immediately below the phrase, "Expected Performance;
24 isn't that true?
25    A   That's true

Page 100

1    Q   And they appear above a performance rating where
2 the number 1 and "Expected" appears. Number 1 is circled,
3 and the rating is expected, correct?
4    A   Correct.
5    Q   So as far as one can tell from the evaluation
6 instrument that was completed by Leonel Gomez on May 23,
7 2002, Mr. Harrison's correct rating on "Exhibits
8 professional behavior towards colleagues" was ranking number
9 1, expected"
10    A   Yes, sir
11    Q   And that would be above needs improvement and
12 below exceptional; is that right?
13    A   That's true
14    Q   And then in the comments section on item 14, there
15 is a discussion of Mr. Harrison writing a letter of apology
16 to Ms. Claus. Do you see that?
17    A   Yes, sir.
18    Q   And do you recognize that -- am I correct in
19 understanding that is in reference to the incident where Mr.
20 Harrison had an excited utterance after he spilled
21 something?
22       MR. THOMPSON  Objection, form
23    A   I'm not sure, but it seems logical  Could have
24 been another incident.
25    Q   (Mr. Schulman) Do you know of another incident?

Page 101

1    A   No, I do not
2    Q   Did you notice that Mr. Harrison received his May
3 2002 -- I'm sorry, his 2002 evaluation on May 24th, 2002,
4 according to his signature?
5    A   I didn't notice, but let me check.
6    Q   Thank you.
7    A   He signed it on the 24th.
8    Q   You recognize Mr. Harrison's signature?
9    A   Not really, but close enough
10    Q   Appears to be?
11    A   Appears to be.
12    Q   Okay. So up through the date May 24th, 2002, Mr.
13 Harrison would believe -- would have reason to believe that
14 he was accomplishing the expected level of performance on
15 "Exhibits professional behavior towards colleagues"; is that
16 right?
17       MR. THOMPSON  Objection, form, calls for
18 speculation
19    A   I really can't guess what he would think
20    Q   (Mr. Schulman) Well, if the instrument was being
21 used as it was intended by the supervisor, it was intended
22 for Mr. Harrison on May 24th, 2002 to think that he had
23 achieved the expected level of performance on listening
24 openly to different viewpoints of colleagues when resolving
25 conflict; on refraining from criticizing other faculty

Pat Hobbs

**Page 126**

1    MR. THOMPSON: Objection, form,
2  argumentative.
3    A   I fail to see the connection between the non-
4  renewal policy that we applied and the one that you're
5  trying to build a case for, which is a completely separate
6  policy on discipline. The two policies are not the same,
7  they're different.
8    Q   (Mr. Schulman) Let me ask you a question about a
9  couple of more subject matters, and I guess we'll just agree
10 to disagree about whether you should answer those questions
11 and deal with it later. Texas State Technical College has a
12 Board of Regents, right?
13   A   Yes, sir.
14   Q   That Board of Regents is appointed, not elected,
15 correct?
16   A   Correct.
17   Q   So in that respect, this institution is different
18 than say a public school district?
19   A   Yes, sir.
20   Q   Okay. The Texas State Technical College doesn't
21 have any independent taxing authority in the sense that a
22 public school district does; isn't that true?
23   A   That's true.
24   Q   As you understand it, with regard to a decision to
25 non-renew or a decision to terminate, the administration is

**Page 127**

1  the final decision maker and the Board of Regents plays no
2  role: is that correct?
3    A   That's correct. I think in one of the policies,
4  the grievance -- or the disciplinary policy, the grievance
5  procedure can reach the board, but not in the policy of non-
6  renewal. I'm not sure. I would have to read it again.
7    Q   Okay. Which policy -- just for my education,
8  which policy is it that you think might reach the board?
9    A   Discipline, dismissal of contracted employee,
10 maybe. I may have it confused with another policy.
11   Q   Did you attend the grievance hearing that Mr. Leal
12 allowed in this matter?
13   A   Did not.
14   Q   Did he report to you about it?
15   A   I don't recall that he did.
16   Q   Do you know if any notes were taken about that
17 proceeding?
18   A   I do not.
19   Q   Do you know whether Dr. Leal ordinarily records or
20 takes notes of grievance proceedings?
21   A   To my knowledge, he doesn't record meetings. He
22 may have a witness present.
23   Q   Did it come to your attention when you handed Mr.
24 Harrison his non-renewal notice that he had -- that he was a
25 union member?

**Page 128**

1    A   Had no idea.
2    Q   Did he tell you, "I'm a union member, and I'll
3  have my lawyer contact you"?
4    A   No, he didn't.
5    Q   In the academic year after Mr. Harrison was
6  terminated, did the Texas Faculty Association elect officers
7  on this campus, sir?
8    A   I don't know.
9    Q   Did it come to your attention that the president
10 and vice president of the Texas Faculty Association chapter
11 on this campus were non-renewed on the same day?
12   A   Same day as what?
13   Q   In the next academic year?
14   A   But the same day as what?
15   Q   Oh, let's say as the same day that the president
16 of the Waco chapter was non-renewed or terminated?
17   A   I don't understand the question
18   Q   Did it come to your attention that the Texas State
19 Technical College terminated three union officers on or
20 about the same day in the next year after Mr. Harrison was
21 non-renewed?
22   A   It may have been brought to my attention later,
23 but there's no connection here
24   Q   Who brought it to your attention, the best you can
25 recall?

**Page 129**

1    A   What? The non-renewal of --
2    Q   The non-renewal of the union officers?
3    A   I can't recall, specifically, but it must have
4  been as a result of those faculty member filing some sort of
5  appeal or grievance or something.
6    Q   And were you involved in the grievances or appeals
7  with regard to the two gentlemen, the president of the
8  union, and the vice president of the union here?
9    MR. THOMPSON. Objection, form.
10   A   I don't remember meeting anybody here.
11   Q   (Mr. Schulman) Okay. To the best of your
12 recollection, you were not involved in grievance procedures
13 about those two gentlemen being non-renewed?
14   A   I was involved in a mediation hearing regarding
15 two gentlemen that we had non-renewed from here.
16   Q   And did they happen to be the president and vice
17 president of the local chapter of the union?
18   A   I think they were. I didn't know at the time,
19 but --
20   Q   And to the best of your recollection, were they
21 terminated on or about the same day that the union chapter
22 president in Waco was terminated, sir?
23   MR. THOMPSON: Objection, form
24   A   I found that out later.
25   Q   (Mr. Schulman) And did you find out later that

APP-11

Pat Hobbs

## Page 130

1 the termination of these three union officers was at the
2 direction of the system headquarters in Waco, sir?
3           MR. THOMPSON   Objection, form.
4     A   No          ,
5     Q   (Mr. Schulman)  Do you know whether or not that's
6 true? -
7     X   No
8           MR. SCHULMAN   I'm going to ask Mr Harrison
9 a question  I'm going to take a little break.  Now never
10 trust a lawyer who says this, but I think I'm almost done
11         (OFF THE RECORD) (3 17-3 19)
12    Q   (Mr. Schulman)  It's going to be one of those rare
13 instances where a lawyer follows up as represented.
14          MR. SCHULMAN  No further questions at this
15 time.  Pass the witness.
16         E X A M I N A T I O N
17 BY MR. THOMPSON.
18    Q   The two individuals from TSTC who were non-renewed
19 the year after Mr. Harrison was, do you recall that
20 question?
21    A   Yes.
22    Q   Do you know anything about the two individuals
23 that are the subject of those questions?
24    A   Yeah, I non-renewed them.  They were my faculty
25    Q   Who made the decision to non-renew them?

## Page 131

1     A   I did
2     Q   Did anybody from TSTC's central administration in
3 Waco have any role in your decision to non-renew those two
4 individuals?
5     A   No, sir.
6     Q   Did you consult with anybody at TSTC in Waco about
7 the non-renewal of those two individuals, prior to doing it?
8     A   I think we might have consulted with the HR
9 office  We were asked to let them know when we're going to
10 make those kinds of decisions and what the situation is, and
11 then we made the decision
12    Q   Okay.  If you coordinate for HR purposes with
13 somebody in Waco, does that mean they're telling you what to
14 do?
15    A   No, sir.  We still are autonomous
16    Q   Okay.  Did anyone from the chancellor's office
17 have any input, to your knowledge, in the decision that you
18 made regarding those two instructors?
19    A   To non-renew?
20    Q   Yes.
21    A   No, sir.
22    Q   All right.  Okay.  You testified earlier today
23 that some memo containing reference to discussions about
24 organizing -- employees organizing because of certain
25 complaints or whatever, was included in the packet of

## Page 132

1 information that came to you along with the recommendation
2 from Mr. Harrison's coworker that he be non-renewed.  Do you
3 remember that testimony?
4     A   Yes, sir
5     Q   Was that testimony accurate?
6     A   What I was meaning that there was a packet of
7 copies of e-mails, and memos, and stuff that the faculty
8 provided to me with their cover memo, and those items that
9 were included in that packet were part of my decision to
10 consider non-renewal
11    Q   Okay.  And are you sure as you sit here today what
12 e-mails were in that packet?
13    A   No, sir
14    Q   Are you sure -- well, let me ask you again.  Was
15 your testimony that the e-mail referenced by the plaintiff's
16 attorney was one of those documents attached to the packet?
17          MR. SCHULMAN  Objection, form of the
18 question.
19    A   If I specifically referenced a certain e-mail,
20 then I was in error  I was talking about that whole packet.
21 If it was in the packet, it was -- it was part of our
22 consideration of Mr Harrison's unprofessional behavior  If
23 it wasn't there, then it wasn't there, and it wasn't part of
24 the package, and it wasn't part of the consideration
25    Q   (Mr. Thompson)  Okay.  When is your first

## Page 133

1 independent recollection of ever having heard or seen --
2 heard anything about or see the e-mail or the document -- I
3 don't know if it's an e-mail, I apologize -- referencing
4 causing people to organize?
5     A   I'm having to dig back now on the mediation that
6 we had a couple of years ago  I think that's the first that
7 we had heard of it
8     Q   Okay.  So why would you have testified today, if
9 the first we had heard of that e-mail was at the mediation,
10 that it was part of the packet that you reviewed at the time
11 you came up with the --
12    A   I don't know.  I guess --
13    Q   May I finish my question?
14    A   Sure
15    Q   Why would you have testified earlier today, in
16 light of that fact, that the e-mail containing a reference
17 to organizing was part of the packet that came to you from
18 Mr. Gomez?
19    A   I think I just wasn't paying attention, and was
20 thinking about the package, rather than an individual piece
21 of information within the packet.  The packet is what I
22 remember  I don't remember the individual e-mails in it.
23    Q   If you testified earlier today that -- that
24 that e-mail that you've just testified that you saw and
25 heard about for the first time at mediation in this lawsuit

Action Reporting
(956) 631-1024     APP-12

Pat Hobbs

---

**Page 134**

1 was part of that packet, was that testimony truthful?
2    A    That was in error.
3        MR. THOMPSON:  Pass the witness.
4        R E - E X A M I N A T I O N
5 BY MR. THOMPSON:
6    Q   I believe you told me before I passed you as a
7 witness that it came to your attention that the president of
8 the Waco chapter was also non-renewed in the academic year
9 after Mr. Harrison was non-renewed?
10    A    I know it all happened about the same time.
11    Q    Okay.  And did it also come to your attention that
12 the president of the Waco chapter was reinstated?
13    A    Later, yes, sir.  I don't know that he was
14 reinstated to faculty position.
15    Q    Do you have any knowledge of what position he was
16 reinstated to fill?
17    A    No.  I think it was somewhere in HR.
18    Q    Okay.  And the two gentlemen, the president and
19 vice president of the union here that you non-renewed, who
20 were they?
21    A    Clark Owen was one  God, what was his name,
22 Charles -- I'm drawing a blank, telecom instructor.  I can't
23 think of his last name, sorry
24    Q    And was it happenstance, Mr. Hobbs, that you non-
25 renewed the president and vice president of the union local

---

**Page 135**

1 here in Harlingen on or about the same day?
2    A    I had no idea, my recollection, that they were
3 officers of the -- of the union.  We non-renewed them based
4 on -- on sets of performance standards that we considered in
5 those non-renewing actions
6    Q    Your decision to non-renew those two gentlemen,
7 the two union officers down here, was challenged, was it
8 not?
9    A    Yes, it was
10    Q    And I heard you testify earlier that that matter
11 was adjusted in a mediation; is that correct?
12    A    Yes, sir, it was
13    Q    I'm not going to ask you what the details were.
14 At any rate, the response of Texas State Technical College
15 to the termination of those three union officers was to
16 reinstate one and make an adjustment in the case of the
17 other two; is that right?
18    A    They weren't terminated  They were non-renewed.
19    Q    Non-renewed; is that correct?
20        MR. THOMPSON  Objection, form
21    A    Ask the question again.
22    Q    (Mr. Schulman)  The ultimate result of the
23 termination of the three union officers in the year after
24 Mr. Harrison was non-renewed was one man was reinstated and
25 there was some form of mediated adjustment for the other

---

**Page 136**

1 two; is that correct?
2        MR. THOMPSON:  Objection, form.  He just
3 testified they weren't terminated.
4    Q    (Mr. Schulman)  I'm sorry.  I'm going to say
5 separation.  Let me rephrase it.  I'll try to use a non --
6 noncontroversial word.  The ultimate result from the
7 termination of three union officers --
8        MR. THOMPSON:  Counsel, you just did it
9 again.
10        MR. SCHULMAN:  Ultimate result, that isn't --
11        MR. THOMPSON:  From the termination
12        MR SCHULMAN:  Okay  All right  You're
13 laughing at me with good cause
14    Q    (Mr. Schulman)  The ultimate result from the
15 separation of three union officers in the academic year
16 after Mr. Harrison was non-renewed, was that one of them was
17 reinstated and there was some form of adjustment in the
18 other two cases; is that correct?
19    A    To the best of my knowledge, yes
20    Q    And you told the assistant attorney general that
21 you might have consulted with HR in Waco before you non-
22 renewed the president and vice president of the local here;
23 is that right?
24    A    That I might have have?
25    Q    You might have consulted with HR at the system

---

**Page 137**

1 headquarters in Waco before you non-renewed the president
2 and vice president of the union down here in Harlingen?
3        MR. THOMPSON  Objection, form
4    A    I might have
5    Q    (Mr. Schulman)  Okay.  Is it your best
6 recollection that you did?
7    A    No, but it's not out of the question.
8    Q    And then I think you went on to say that it would
9 be not unusual, or -- I didn't quite catch it and I didn't
10 write it down well -- it wouldn't be unusual, or it wouldn't
11 be inappropriate for you to consult with the HR office about
12 non-renewal of those two gentlemen under the circumstances;
13 is that right?
14    A    As our procedures in the -- our relationship with
15 the systems office has evolved in the last several years, we
16 turn more and more to the systems office for consultations
17 on certain items
18    Q    Such as non-renewals of faculty, sir?
19    A    It's possible
20    Q    Is it similarly possible that you consulted with
21 the systems office about the non-renewal of Mr. Harrison?
22    A    I don't recall that at all.
23    Q    Do you deny it?
24    A    That was in 2002  Can't deny it, can't confirm
25 it.

---

APP- 13

Pat Hobbs

Page 138

1   Q   Would it be fair to say that you've had a change
2 -- a substantial change in your testimony about what was in
3 the packet of material that was presented to you in support
4 of Mr. Harrison's termination during the course of this
5 deposition?
6          MR. THOMPSON: Objection, form
7   A   Mr. Harrison's non-renewal.
8   Q   (Mr. Schulman) Non-renewal.
9   A   Yes, sir.
10   Q   Okay.
11   A   And I apologize for that error.
12   Q   And would it be fair to say that you have changed
13 your testimony after several consultations with the
14 assistant attorney general?
15          MR. THOMPSON: Now you can't ask him what he
16 and I talked about.
17          I instruct you not to answer that question
18   Q   (Mr. Schulman) Would it be fair to say that after
19 you gave your first testimony that the package in support of
20 Mr. Harrison's termination contained information that --
21 contained information where he said, "This is the kind of
22 thing that causes people to form unions", that when you said
23 that, the assistant attorney general became visibly upset?
24          MR. THOMPSON: Objection, form.
25   A   I wasn't watching him, but all I was referring to

Page 139

1 was what was in the packet. If it wasn't in the packet,
2 then it wasn't part of the consideration.
3          MR. THOMPSON: I'll stipulate I was visibly
4 upset, because I knew the testimony was inaccurate, since
5 you're -- since you want to put that as part of the record
6          MR. SCHULMAN: I am -- not only that, I will
7 say that you became visibly upset. At the first break you
8 immediately started suggesting to him that his testimony was
9 inaccurate. I have never seen such gross and shocking
10 coaching.
11          MR. THOMPSON: You drug this information out
12 of him with three questions that predicated the one by
13 tagging onto the end of other questions this information
14 about this e-mail, without ever -- with no proof or
15 suggestion, whatsoever, that this man ever saw it.
16          MR. SCHULMAN: The record --
17          MR. THOMPSON: You confused him, and the
18 record will reflect --
19          MR. SCHULMAN: The record will reflect --
20          MR. THOMPSON: -- what you did.
21          MR. SCHULMAN: And the record will reflect
22 that he said he saw the packet, and he was the one who --
23          MR. THOMPSON: Well, if you're proud that you
24 got --
25          MR. SCHULMAN: He testified --

Page 140

1          MR. THOMPSON: If you're proud that got
2 inaccurate testimony out of him, then I'm fine, I'm proud
3 for you
4          MR. SCHULMAN: And he was the one who chose
5 the word "malcontent", evidence of malcontent when referring
6 to union activity I did not choose those words The
7 record will speak for itself
8   A   I was not referring to any union document I was
9 referring to the packet
10          MR. THOMPSON: Well, we're not going to argue
11 about this on the record any more.
12          MR. SCHULMAN I don't have any further
13 questions for you, sir, and I sure thank you for all of the
14 attention that you've given me (3 33)
15          MR. THOMPSON I may have one clarifying
16 question just to make sure the record is accurate
17        R E E X A M I N A T I O N
18 BY MR. THOMPSON.
19   Q   Of the three individuals that you've been asked
20 about from other -- the non-renewals here, two from here and
21 one from Waco, tell me about what you think the resolution
22 was as to the two people here in Harlingen. What happened
23 to those two people?
24   A   Can I discuss that?
25   Q   Yes, you can.

Page 141

1   A   The result of mediation?
2   Q   No, not what happened at the mediation, but --
3 you've already testified --
4   A   The ultimate --
5   Q   -- what the ultimate decision was, or resolution.
6   A   The ultimate decision for Clark Owen was that he
7 was reinstated to faculty. The other gentleman was offered
8 a settlement so that he would not return.
9   Q   Okay. And how about the person in Waco? Do you
10 have any idea what happened to that person?
11   A   I have an idea that he was, I mean, re-employed,
12 but not in a faculty role. I don't know exactly where he
13 was put, but, you know, I know he was re-employed somehow,
14 as a result of, I guess, their mediation, I don't know.
15   Q   So I think two were reinstated in some way and an
16 accommodation, otherwise, was made with one, which is not
17 precisely what happened --
18          MR. THOMPSON: What you heard a minute ago
19 I wanted to clarify that.
20          MR. SCHULMAN: Okay.
21          MR. THOMPSON: And I have no further
22 questions. (3:34)
23        R E-E X A M I N A T I O N
24 BY MR. SCHULMAN:
25   Q   With regard to the replacement of the union

APP- 14

Pat Hobbs

**Page 154**

1  Q   If you saw something that you considered worthy of
2 discipline, you certainly had the authority to tell Mr.
3 Gomez that he should start using the disciplinary procedure
4 that's found in Exhibit 7, right?
5  A   I had that authority, yes.
6  Q   And you didn't do that, did you?
7  A   I did not direct Leo to start disciplinary action,
8 no. I'm not sure I didn't mention to him that those
9 statements were inappropriate and to call them to Jon's
10 attention. I don't remember
11  Q   You're not sure whether you did or you didn't?
12  A   I'm not sure whether I did or didn't.
13  Q   Okay. But if you had asked Leonel Gomez to use
14 the disciplinary procedure, then the college would have been
15 obliged to present the charges to Mr. Harrison and allow him
16 to present his side of the story, right?
17  A   If it had been deemed a disciplinary action, and
18 that policy was invoked, then, yes, the policy would have
19 been followed.
20  Q   But, instead, I think you told me in your
21 deposition earlier today you tucked it away in your head,
22 right?
23  A   Well, I'm saying that the -- the policy was not
24 applied in that instance It was taken care of in another
25 fashion by the supervisor

**Page 155**

1  Q   Do you know whether the supervisor took care of it
2 in any fashion, whatsoever?
3  A   I do not.
4  Q   Then why did you just testify that he did?
5  A   Well, it wasn't brought to me. I'm assuming it
6 was taken care of
7  Q   Okay.
8      MR. SCHULMAN: No further questions
9      MR. THOMPSON: That's it.
10      (Short Break)
11      MR. SCHULMAN: Okay. We have reached an
12 agreement off the record that this deposition transcript,
13 when it is available, can be used for purposes of a summary
14 judgment response before it is read and signed by the
15 witness. Is that right?
16      MR. THOMPSON: That's correct.
17
18      (The deposition was concluded at 3:57 p m.)
19
20
21
22
23
24
25

**Page 156**

STANLEY PAT HOBBS - 5/17/06
CHANGES AND SIGNATURE

PAGE   LINE   CHANGE       REASON

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

**Page 157**

I, STANLEY PAT HOBBS, have read the foregoing
deposition and hereby affix my signature that same is true

and correct, except as noted above

_____
STANLEY PAT HOBBS

THE STATE OF TEXAS    •

    Before me, _____. on this day personally
appeared STANLEY PAT HOBBS, known to me (or proved to me
under oath or through _____) (description of
identity card or other document) to be the person whose name
is subscribed to the foregoing instrument and acknowledged
to me that they executed the same for the purposes and
consideration therein expressed
    Given under my hand and seal of office this      day
of _____, 2006

_____
NOTARY PUBLIC IN AND FOR
THE STATE OF TEXAS

Action Reporting
(956) 631-1024


APP-16